

# The Attorney General of Texas

September 10, 1985

JIM MATTOX
Attorney General

Supreme Court Building
P. O. Box 12548
Austin. TX. 78711- 2548
512/475-2501
Telex 910/874-1367
Telecopier 512/475-0266

714 Jackson, Suite 700
Dallas, TX. 75202-4506
214/742-8944

4824 Alberta Ave., Suite 160
El Paso, TX. 79905-2793
915/533-3484

1001 Texas, Suite 700
Houston, TX. 77002-3111
713/223-5886

806 Broadway, Suite 312
Lubbock, TX. 79401-3479
806/747-5238

4309 N. Tenth, Suite B
McAllen, TX. 78501-1685
512/682-4547

200 Main Plaza, Suite 400
San Antonio, TX. 78205-2797
512/225-4191

An Equal Opportunity/
Affirmative Action Employer

Mr. Philip F. Ricketts
Chairman of the Commission
Public Utility Commission of Texas
7800 Shoal Creek Boulevard
Suite 400N
Austin, Texas    73757

Opinion No. JM-353

Re:  Authority of the Public
Utility Commission of Texas to
certificate facilities of co-
generators making retail sales
of electricity

Dear Mr. Ricketts:

You ask whether the Public Utility Commission of Texas [PUC] has authority under section 49(a) of the Public Utility Regulatory Act, article 1446c, V.T.C.S., to certificate facilities of cogenerators making retail sales of electricity.

We will provide some background about cogenerators and relevant federal law before addressing your specific question. A cogenerator produces both electric energy and steam, heat, or some other form of useful energy that it uses for its own industrial purposes. 16 U.S.C. §796(18)(A) (1932); Federal Energy Regulatory Commission v. Mississippi, 456 U.S. 742, 750 n. 11 (1982); Attorney General Opinion MW-45 (1979). Cogenerators may produce excess electricity, which they traditionally have been unable to market because electric utilities have been reluctant to purchase from them. Id. Some intrastate utilities have refused to connect with other systems to avoid being subject to the full range of federal regulation. American Paper Institute v. American Electric Power, 461 U.S. 402, 422 n. 12 (1983).

As part of 1978 legislation designed to conserve energy, Congress enacted provisions encouraging increased use of excess electricity produced by a cogenerator. Federal Energy Regulatory Commission v. Mississippi, supra; Public Utility Regulatory Policies Act of 1978, 16 U.S.C. §824a-3 (1982). The statute directs the Federal Energy Regulatory Commission [FERC] to promulgate rules setting rates for purchases and sales of electric energy between "qualifying" cogenerators. FERC is to establish the size, fuel use, and fuel efficiency requirements of a "qualifying cogeneration facility." 16 U.S.C. §796(18)(B) (1982). Its rules are to require that electric utilities offer to buy electricity from and sell it to cogenerators; state regulatory agencies are required to implement these rules. 16 U.S.C. §824a-3(a), (f), (h) (1982). Qualifying cogeneration facilities may be exempted by FERC rule from

> State laws and regulations respecting the rates,
> or respecting the financial or organizational
> regulation, of electric utilities . . . if the
> Commission determines such exemption is necessary
> to encourage cogeneration. . . .

16 U.S.C. 3824a-3(c) (1982).

In light of 16 U.S.C. section 824a-3, the Texas Legislature amended the Public Utilities Regulatory Act [PURA]. Senate Bill No. 605 amended the definitions of "public utility" in subsection 3(c) of article 1446c, V.T.C.S., as follows:

> (c) The term 'public utility' or 'utility,'
> when used in this Act, includes any person,
> corporation, river authority, cooperative corpora-
> tion, or any combination thereof, other than a
> municipal corporation or a water supply or sewer
> service corporation, or their lessees, trustees,
> and receivers, now or hereafter owning or opera-
> ting for compensation in this state equipment or
> facilities for:
>
> (1) producing, generating, transmitting, dis-
> tributing, selling, or furnishing electricity
> ('electric utilities' hereinafter) provided, how-
> ever, that this definition shall not be construed
> to apply to or include a qualifying small power
> producer or qualifying cogenerator, as defined in
> Sections 3(17)(D) and 3(18)(C) of the Federal
> Power Act, as amended (16 U.S.C. Sections
> 796(17)(D) and 796(18)(C)). . . .     (Emphasis
> added).

Acts 1981, 67th Leg., ch. 31, at 70; codified at V.T.C.S. art. 1446c, §3, subsection (c) (added language emphasized). The Bill Analysis to Senate Bill No. 605 states in part

> The [Cogeneration] Task Force determined that a
> need exists to modify Texas law to comply with the
> federal mandate that the states act in such a way
> that cogenerators will not be treated as 'public
> utilities.' Potential cogenerators have not fully
> pursued production of electric power by co-
> generation due to the PUC designation as 'public
> utility.' Given the opportunity to sell surplus
> power back to the utility companies, industrials
> and private individuals would have the incentive
> to actively develop cogeneration plants, sources
> of valuable energy.

Bill Analysis to Senate Bill No. 605 prepared for House Committee on State Affairs, filed in Bill File to Senate Bill No. 605, 67th Leg., Legislative Reference Library (1981).

The 1981 amendment to subsection 3(c) removed cogenerators from the definition of "public utility," and therefore rendered many PURA provisions inapplicable to such entities.

The question you present is whether the 1981 amendment to section 3(c) rendered article VII of PURA (sections 49 through 62), which governs certificates of convenience and necessity, inapplicable to qualifying cogenerators. At the time the legislature added the language regarding cogenerators to section 3(c), article VII of PURA contained the following language:

> Sec. 49. For the purposes of this article only:
>
> (a) 'Retail public utility' means any person, corporation, [water supply or sewer service corporation,] municipality, political subdivision or agency, or cooperative corporation, now or hereafter operating, maintaining, or controlling in Texas facilities for providing retail utility service.
>
> (b) <u>'Public utility' does not include any person, corporation, municipality, political subdivision or agency, or cooperative corporation under the jurisdiction of the Railroad Commission.</u> [For the purposes of this article only, 'public utility' includes a water supply or sewer service corporation]. (Emphasis and brackets added).

Art. 1446c, §49 (language in brackets added by Acts 1979, 66th Leg., ch. 57, §4, at 95; underlined language deleted by Acts 1983, 68th Leg., ch. 263, §24 at 1222).

The point of contention in the briefs submitted to us is whether the exemption of cogenerators from the definition of "public utility" in section 3(c) automatically exempted cogenerators from the definition of "retail public utility" in section 49. Those who take the position that a cogenerator can no longer be a "retail public utility" argue that "retail public utility" in section 49 is a subset of "public utility" in section 3(c) and that "retail public utility" can, therefore, be no broader than "public utility" except insofar as section 49 explicitly broadens the section 3(c) definition of "public utility." Since section 49 does not list cogenerators as "retail public utilities," they argue, cogenerators cannot be "retail public utilities." Those on the other side of the issue argue that "retail public utility" in section 49 is to be read without reference to the

definition of "public utility" in section 3(c). Thus, because the legislature did not amend section 49 to exclude cogenerators, they argue, cogenerators can still be "retail public utilities." Neither interpretation is fatuous; nor is either interpretation wholly satisfactory.

Logic and good drafting would dictate that, having already defined "public utility," the authors of PURA would define "retail public utility" as a "public utility" with the characteristic "retail." The language of section 49, however, suggests that they did not do so. If the authors of the act had intended to define "retail public utility" as a subset of "public utility" in section 3(c), they could have simply written,

> A 'retail public utility' is a public utility that provides retail services . . . . For the purposes of this Act only, municipalities . . . are public utilities.

Instead, the definition of "retail public utility" consists of a seemingly comprehensive list of included entities, as if it were written from scratch. Also, the language in section 49 is not consistent with the language in section 3(c). For example, section 49 uses "municipality," while section 3(c) uses "municipal corporation." Thus, both the structure and wording of section 49 suggest that section 49 was originally written without reference to section 3(c).

Another reason for assuming that article VII was written without reference to section 3(c) is that the term "public utility" appears repeatedly in article VII -- "retail public utility" appears only twice -- in provisions that logically apply to all entities that must obtain a certificate of convenience and necessity under article VII. Applying the section 3(c) definition of "public utility" to those provisions would exclude "retail public utilities" from the scope of those provisions. We think such a reading would be nonsensical. The supreme court came to the same conclusion in City of Coahoma v. Public Utility Commission, 626 S.W.2d 488 (Tex. 1981). In Coahoma the court considered whether "public utility" in section 53 included a municipality, which is not a "public utility" as defined in section 3(c) but is a "retail public utility" under section 49. The court held that "public utility" in section 53 included a "retail public utility," because, given the obvious purpose of article VII, it would be unreasonable to conclude that the legislature meant "public utility" as defined in section 3(c) when it used the term "public utility" in section 53. Thus, Coahoma supports the argument that article VII was written without reference to section 3(c).

Given the wording of article VII and the sensical construction of the article, we think it is reasonable to conclude that the legislature did not intend "retail public utility" in section 49 to be

limited by the definition of "public utility" in section 3(c). Further, we think that when the legislature exempted cogenerators from the definition of "public utility" in section 3(c), it assumed that the amendment would not exempt cogenerators from the definition of "retail public utility" in section 49. The bill analysis of that amendment indicates that the legislature's intent was to give co-generators "the opportunity to sell surplus power back to the utility companies." Bill Analysis to Senate Bill No. 605, supra, (emphasis added). Nothing in the legislative history indicates that the legislature intended to encourage cogenerators to make retail sales of electricity. Also, the bill analysis states that the amendment was to bring Texas law into compliance with the federal mandate. The mandate of the federal law on its face is that state regulation should not discourage cogenerators from selling electricity to and buying electricity from utility companies. See also 16 U.S.C. §824a-3(a) (1982).

Although the question is a difficult one, we conclude that the Public Utility Commission of Texas has jurisdiction to require a qualifying cogenerator making or planning to make retail sales to obtain a certificate of convenience and necessity.

### S U M M A R Y

The Public Utility Commission of Texas has jurisdiction under the Public Utilities Regulatory Act, article 1446c, V.T.C.S., to promulgate a rule requiring qualifying cogenerators making or planning to make retail sales to obtain a certificate of convenience and necessity.

Very truly yours

JIM MATTOX
Attorney General of Texas

TOM GREEN
First Assistant Attorney General

DAVID R. RICHARDS
Executive Assistant Attorney General

ROBERT GRAY
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

p. 1617

Prepared by Sarah Woelk
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

Rick Gilpin, Chairman
Steve Davis
Tony Guillory
Mary Keller
Jennifer Riggs
Sarah Woelk